**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, | ) ) ) |
| Defendant. | ) ) ) |

Civil No. 20-1400 (CRC)

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Prominent among the many controversies that have marked the presidency of Donald Trump are his frequent stays at his own properties and the attendant costs to the Secret Service of protecting him during those stays—costs that inure to the benefit of the President. This case concerns a Freedom of Information Act ("FOIA") request CREW filed with the Secret Service, a component of the U.S. Department of Homeland Security ("DHS"), to obtain additional details about the costs to the taxpayers of one of those trips to the President's resort in Scotland. While the Secret Service has disclosed many details of the expenses the Secret Service incurred, it has refused to disclose room rates and the total cost of meals and incidentals paid to the Trump Turnberry Golf Resort, claiming they are exempt under FOIA Exemptions 7(E) and 7(F).[1] The reasoning behind its invocation of Exemption 7 is, however, fundamentally flawed.

---

[1] The Secret Service withheld other trip expense information that CREW does not challenge.

Without question, the security and safety of the President and those who protect him are of paramount importance. Disclosing the information at issue here, however, poses no risk to their safety or security and DHS's arguments to the contrary are both illogical and factually wrong. The simple truth is that disclosing the room rates and hotel incidentals would not reveal the size of the protective detail—the information DHS seeks to protect—which in any event does not qualify as a law enforcement technique or procedure. As a necessary corollary, disclosure also would cause no harm within the scope of Exemption 7(F)'s protection. Disclosure would, however, beneficially reveal to the public the costs of essentially a forced stay at one of the President's expensive resorts, money that flows to the President because he has refused to divest of his significant financial holdings. That is information the public has a right to know.

## FACTUAL BACKGROUND

On July 31, 2018, Senator Tom Carper, Senator Elizabeth Warren, and the Chair and Ranking Member of the House Committee on Oversight and Government Reform wrote to request that the DHS Office of Inspector General ("OIG") conduct an audit of the expenses that the Secret Service incurred for President Trump's visit to the Trump Turnberry Resort in Scotland from July 14-15, 2018.[2] The letter noted that during his stay at the Trump property, President Trump "made no public appearances and played two rounds of golf." *Id.* The letter further noted that the total price tag for the trip was up to $1.2 million, "with payments to Trump Turnberry potentially exceeding $100,000[.]" *Id.* The letter posed eight questions for the OIG to

---

[2] The congressional request can be found at https://www.carper.senate.gov/public/ _cache/files/6/3/63bf8367-b346-42e1-a366-7ee56d0e0e8a/4FEE952FBA58E348 DD5FCDF75C789F32.2018-07-31-carper-warren-cummings-letter-to-dhs-oig.pdf.

answer, including how much the Secret Service had spent on meals and other incidental costs at Trump Turnberry and the hotel room rate at the resort. *Id.*

The OIG conducted the requested audit and published its report with redactions made at the request of the Secret Service.[3] The redactions include the *estimated* total costs for meals and incidentals and the hotel room rates. OIG Audit at 2, 4, 5. By contrast, the total costs for hotel rooms and other expenses, including commercial airfare and golf cart rentals, were not redacted. *Id.* at 2, 3. So, for example, the OIG Audit discloses that the Secret Service spent a total of $923 to rent nine golf carts for two days. *Id.* at 4.

On March 24, 2020, CREW submitted a FOIA request by email to the OIG seeking an unredacted copy of the OGE Audit. Compl. ¶ 21. By letter dated April 1, 2020, the OIG advised CREW that after a consultation, the Secret Service had asserted FOIA Exemptions 7(E) and 7(F) to withhold the redacted information. This letter is Exhibit 2 to the Declaration of Camille Callender ("Callender Decl.") (ECF No. 9-3). No other document accompanied the response of the OIG.

CREW filed an administrative appeal on April 3 challenging the redactions made pursuant to Exemptions 7(E) and (F). Compl. ¶ 24. CREW's appeal explained that because the redacted material consists of dollar figures for some, but not all, expenses the Secret Service had incurred it is impossible to fathom how providing the total costs and the component costs of meals, incidentals, and hotel rooms could reasonably be expected to endanger an individual's life or safety, or disclose a law enforcement technique or procedure. *Id.* ¶ 27. CREW further

---

[3] The audit is Exhibit 3 to Defendant's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("D's Mem.") (ECF No. 9-4) and is referred to herein as "OGE Audit."

explained the lack of a meaningful distinction between the costs included in the OIG Audit and those that were redacted. *Id.*

When DHS failed to decide CREW's appeal within the 20-business day statutory period, CREW filed suit on May 27, 2020, challenging all the Exemption 7(E) and 7(F) redactions. At this point, CREW is contesting only the withholding of the room rates and the total cost of meals and incidentals paid to the Trump Turnberry Golf Resort.

## LEGAL STANDARDS

Congress enacted the FOIA to create an enforceable, statutory right of "access to official information long shielded unnecessarily from public view." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). As the Supreme Court has explained, the "core purpose" of the FOIA is to increase "public understanding of the operations or activities of the government." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 775 (1989) (internal quotation marks omitted).

The agency bears the burden of demonstrating that its withholdings properly fall within one of the FOIA's nine exemptions. *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999); *see also* 5 U.S.C. § 552(a)(4)(B). Further, "[c]onsistent with the Act's goal of broad disclosure," these exceptions must be narrowly construed, *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989), and the underlying facts "viewed in the light most favorable to the requester," *Weisberg*, 705 F.2d at 1350.

FOIA cases typically are decided on summary judgment, with the movant required to show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the FOIA context, an agency "fully discharge[s]" its

statutory obligations, *Weisberg*, 705 F.3d at 1350, by providing "a detailed description of the information withheld[.]" *Hussain v. DHS*, 674 F. Supp. 2d 260, 267 (D.D.C. 2009). A court may grant summary judgment only if the agency's submissions "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).

## ARGUMENT

### I.   The Withheld Information Does Not Fall Within the Protection Of FOIA Exemption 7.

DHS has relied on Exemptions 7(E) and 7(F) to redact information from the OIG report that it claims would reveal the number of Secret Service personnel on the protective detail for the Turnberry trip. *See* Declaration of Ronald L. Rowe, ECF No. 9-2 ("Rowe Decl.") ¶¶ 5-14; D's Mem. at 10-16. Both exemption claims fail.[4]

### A.   DHS is Improperly Withholding Material under FOIA Exemption 7(E).

To satisfy Exemption 7(E), an agency must show three things: (1) the records were "compiled for law enforcement purposes," (2) the records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions," and (3) "such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E); *see also Blackwell v. FBI*,

---

[4] DHS also invokes Exemptions 7(E) and 7(F) to redact "the description of certain protective equipment utilized by the protective detail."  Rowe Decl. ¶ 8. CREW does not challenge those redactions.

5

646 F.3d 37, 42 (D.C. Cir. 2011). The agency must "provide some explanation of what procedures are involved and how they would be disclosed"; a "near-verbatim recitation of the statutory standard is inadequate." *CREW v. U.S. Dep't of Justice*, 746 F.3d 1082, 1102 (D.C. Cir. 2014). The agency must also "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42.

Here, DHS has invoked Exemption 7(E) to redact two categories of material: (1) information purportedly "directly" revealing "the number of Secret Service personnel" on the Turnberry trip, Rowe Decl. ¶¶ 7, 9, and (2) information that DHS claims would "indirectly" reveal that number, *id.* ¶ 7, specifically "individual room rates for single and double rooms paid at the Trump Turnberry Resort," *id.* ¶ 10, the "total cost of meals and incidental expenses" for the trip, *id.* ¶ 11, and the "total cost of the trip," *id.* ¶ 12. This exemption claim fails for several reasons.

First, DHS has not shown that disclosing the number of Secret Service personnel assigned to the Turnberry trip (either directly or indirectly) would reveal law enforcement "techniques and procedures" or "guidelines" protected by Exemption 7(E). "The terms 'techniques' and 'procedures' refer to specific methods of law enforcement, not policy and budgetary choices about the assignment of personnel," such as the "historical staffing" information DHS seeks to withhold here. *Families for Freedom v. Customs & Border Protection*, 837 F. Supp. 2d 287, 299 (S.D.N.Y. 2011). Nor does such historical staffing information qualify as a law enforcement "guideline." *Id.* (rejecting Exemption 7(E) claim as to "historical" data on "Border Patrol officer staffing levels" in a particular sector because exemption does not protect

"staffing decisions defendants made years ago," and "[r]elease of historical staffing statistics could not reasonably be expected to risk circumvention of the law").

    None of the cases DHS cites alter this conclusion. *See* D's Mem. at 11. The documents at issue in *Whitfield v. U.S. Dep't of Treasury*, 2006 WL 2434923, at *6 (D.D.C. Aug. 22, 2006), if disclosed would reveal "arrest location, the staging area, equipment, and the law enforcement personnel involved in the plaintiff's arrest," an assessment of the "level of risk involved in [the p]laintiff's arrest," and general "law enforcement procedures and strategy for conducting an arrest"), *aff'd*, 255 F. App'x 533 (D.C. Cir. 2007). At issue in *Williams v. Dep't of Justice*, 171 F. App'x 857 (D.C. Cir. 2005), were documents that would reveal bank security techniques involving use of bait money. These are in no way comparable to the historical staffing information DHS withheld here.

    DHS also relies heavily on an unpublished, out-of-circuit district court case holding that Exemption 7(E) protected the "number of Secret Service personnel that flew with the 2016 presidential candidates on campaign flights," because, in the court's view, the "redacted information, when extrapolated, [could] enable a person to predict the number of agents assigned to protective details in similar flight operations." *New York Times Co. v. U.S. Secret Serv.*, 2018 WL 722420, at *8 (S.D.N.Y. Feb. 5, 2018). Even assuming this decision reflects a correct application of Exemption 7(E), it is distinguishable because the plaintiff there broadly sought Secret Service staffing information for *all* 2016 campaign flights. *Id.* Disclosure of that information arguably may have revealed recurring staffing patterns that could, in turn, be used to "predict" the "Service's future operations" in staffing protective details for flights. *Id.* Here, by contrast, the redacted information concerns the number of Secret Service personnel on a *single*

7

*trip.* DHS has not plausibly demonstrated that Secret Service's staffing levels for a single trip are indicative of its staffing levels for comparable trips, or otherwise reveal the Secret Service's "techniques" "methods" or "guidelines" in staffing protective details. To the contrary, the Secret Service has elsewhere indicated that whenever the president travels, the agency formulates a unique security plan based on the circumstances on the ground, rather than utilizing the same plan for every trip. *See* Secret Service, FAQ, https://www.secretservice.gov/about/faqs ("When the president travels, an advance team of Secret Service agents works with the host city, state and local law enforcement, as well as public safety officials, to jointly implement the necessary security measures.").

Second, even assuming the mere number of Secret Service personnel on the Turnberry trip could fall within Exemption 7(E), some of the information DHS has redacted would not actually disclose that number, and thus would not be subject to protection even under DHS's theory. For example, DHS has withheld the "individual room rates for single and double rooms paid at the Trump Turnberry Resort" because DHS separately released the "total paid for the hotel rooms," and DHS asserts that comparing that total to the individual room rates would necessarily reveal how many Secret Service agents were on the trip. Rowe Decl. ¶ 10. That is incorrect. Even if the room rates for single and double occupancy rooms were disclosed, it would still be unclear how many personnel stayed in single versus double occupancy rooms, how many personnel stayed in each double occupancy room, of the number of days members of the protective detail stayed in each room. Thus, merely disclosing the room rates would not reveal how many Secret Service employees were in the protective detail.

Third, DHS's claims are also undermined by its previous disclosure of room rates charged to the Secret Service at other Trump properties in response to other FOIA requests. *See, e.g.*, David A. Fahrenthold, Jonathan O'Connell, Carol D. Leonnig, and Josh Dawsey, Secret Service has paid rates as high as $650 a night for rooms at Trump's properties, *Washington Post*, Feb. 7, 2020, https://wapo.st/2EcE2Is; Linnaea Honl-Stuenkel, Secret Service Paid Trump's Doonbeg Resort $15k for Pence's Stay, *CREW*, Mar. 13, 2020, https://bit.ly/2FVRCjX.

Fourth, DHS likewise redacted the Secret Service's "total cost of meals and incidental expenses," on the ground that it too could be used to determine the number of Secret Service personnel on the Turnberry trip. Rowe Decl. ¶ 11. Since the OIG Audit provided "the rate of $92 per day for the meals and incidental expense per diem" for the trip, DHS asserts that the total costs of meals and incidental expenses could somehow be reverse-engineered to "reveal or suggest the number of Secret Service personnel who claimed expenses." *Id.* But to determine that number, one would also need to know the *length* of each employee's trip. Although DHS asserts "the length of the trip can be ascertained through media reports of the protectees' travel," *id.*, such "media reports" would not be an accurate indicator of the length of the Secret Service personnel's stay at Turnberry because, as the OIG observed, the "Secret Service travels to locations before, during, and after the President or other protectees are physically at the site for site preparation and close out activities," D's Mem. Ex. 3 at 7 n.4 (ECF No. 9-4). The OIG "reviewed the hotel invoices to determine the number of travel days for each of the . . . Secret Service employees" on the Turnberry trip, *id.* at 7, but those invoices are not publicly available. Moreover, the OIG adjusted the $92 per diem rate in calculating meal and incidental expenses for the first and last travel days, *see id.* ("on the first and last travel days, we used 75 percent of

the [meal and incidental expense] rate, which was $69 a day"), belying DHS's claim that "simple division" using the $92 rate would necessarily yield the number of personnel on the trip, Rowe Decl. ¶ 11. Further, the OIG Audit describes this cost as an *estimate*, further highlighting its inconclusive nature. OIG Audit at 1, 2.

For all these reasons, disclosing the total cost of meals and incidental expenses—even when combined with other information in the public domain—would not reveal the number of Secret Service personnel on the Turnberry trip. Nor could that number be "easily determined" as a result of the disclosure. Rowe Decl. ¶ 11. Accordingly, the withheld material does not fall within the protection of Exemption 7(E).

### B.     DHS is Improperly Withholding Material under FOIA Exemption 7(F).

To meet its evidentiary burden under FOIA Exemption 7(F), DHS must show that disclosure of the withheld material "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). DHS's Exemption 7(F) claims rest on the erroneous assertion that disclosing the withheld information would reveal a source or method and that revelation, in turn, "risks the safety of other current and future Secret Service protectees, as well as Secret Service personnel, *by exposing these protective operational means and methods*." Rowe Decl. ¶ 13 (emphasis added).

As shown above, disclosing room rates and the estimated meals and incidentals costs would not reveal the number of personnel in the President's protective detail, even if one accepts the dubious proposition that historical data of this kind for one trip constitutes a law enforcement technique or procedure. There simply is no logical connection between the withheld information and the physical safety and security of the President and his protective detail. Absent that

10

connection DHS's claimed expertise in the security issues surrounding the Secret Service's protective function and its "predictive judgments," D's Mem. at 14-15, must yield to common sense.

## II.    DHS Has Failed to Satisfy the FOIA's Foreseeable Harm Requirement.

The 2015 FOIA Improvement Act codified the "foreseeable harm" standard established administratively in 2009 by then-Attorney General Holder. *Rosenberg v. U.S. Dept. of Defense*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018). The FOIA now provides that "[a]n agency shall . . . withhold information under this section only if . . . (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or (II) disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). This court has held that this "foreseeable harm" requirement imposes a tougher standard on agencies to meet. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (describing the new foreseeable-harm requirement as a "heightened standard"); *see also Center for Investigative Reporting v. U.S. Customs & Border Protection*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019). To carry "this independent and meaningful burden," *id.*, an agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[] the harms in [a] meaningful way to the information withheld." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 2019 WL 4644029, *5 (D.D.C. Sept. 24, 2019).

Further, "pursuant to the FOIA Improvement Act, an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d

11

at 98. That is because the independent requirement was "intended to restrict agencies' discretion in withholding documents under FOIA." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106.

In determining whether disclosure would harm an "exemption-protected interest," the "information may not be withheld 'merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears.'" S. Rep. No. 114-4, at 7 (quoting White House Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 4683 (Jan. 21, 2009)). This ensures that agencies "comply" not only "with the letter of" the FOIA, but also "the spirit of the law." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 104 (quoting 162 Cong. Rec. H3717 (2016)). It also reflects Congress' judgment that "[n]ondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve." S. Rep. No. 114-4, at 7.

DHS has not met the foreseeable harm standard here. It relies on speculative and abstract fears that defy common sense. The specter of potential harm to the President and those who are under the protection of the Secret Service obviously raises the most serious of concerns. Here, however, those concerns are not backed up by facts that support a reasonable inference of foreseeable harm from disclosure. Moreover, DHS concedes its showing of harm is "heavily intertwined with the elements required for applying Exemptions 7(E) and 7(F)[.]." D's Mem. at 18. Having failed to satisfy the substantive requirements for invoking Exemptions 7(E) and 7(F), DHS necessarily fails to demonstrate reasonably foreseeable harm.

12

**CONCLUSION**

For the foregoing reasons, the Court should deny DHS's motion for summary judgment and grant Plaintiff's cross-motion for summary judgment.

Dated: September 2, 2020                    Respectfully submitted,

 /s/ Anne L. Weismann
Anne L. Weismann
(D.C. Bar No. 298190)
6117 Durbin Road
Bethesda, MD  20817
Phone: 301-717-6610
Weismann.anne@gmail.com

Adam J. Rappaport
(D.C. Bar No. 479866)
Citizens for Responsibility and Ethics
in Washington
1101 K Street, N.W., Suite 201
Washington, D.C.  20001
Phone: (202) 408-5565
arappaport@citizensforethics.org

*Attorneys for Plaintiff*

13