UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF HOMELAND SECURITY**, <br><br> Defendant. | Case No. 20-cv-1400 (CRC) |

## MEMORANDUM OPINION

This case stems from then-President Donald Trump's 2018 visit to his namesake golf resort in Scotland. The Department of Homeland Security ("DHS") acknowledges that the U.S. Secret Service paid substantial sums to the Trump Turnberry Resort in connection with the trip, including $322,427 for hotel rooms. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") seeks to learn more. It argues that the Freedom of Information Act ("FOIA") requires DHS to disclose the hotel room rates paid by the government, as well as the estimated amount the Secret Service spent on meals and incidental expenses at the resort.

The Court concludes that DHS properly withheld the information that CREW now seeks. The reason has nothing to do with protecting the government or the Trump family business from any potential embarrassment. Rather, the Court is persuaded that releasing the requested data could help outsiders predict the size of future Secret Service details, which could render the Secret Service more vulnerable to circumvention and increase the risk of physical harm to agents and protectees alike. DHS is therefore entitled to summary judgment.

## I. Background

The following facts are not in dispute. On July 14 and 15, 2018, President Trump visited the Trump Turnberry Resort in Scotland. Pl. Response to Def. Statement of Undisputed Material Facts ("Pl. Response to Def. SUMF") ¶ 1, ECF No. 11-2. At the request of several members of Congress, the DHS Office of Inspector General ("OIG") audited the expenses incurred by the Secret Service for that visit and compiled a report ("OIG Report" or "Report"). Id. ¶¶ 1, 3. The agency released a public version of the Report, which discloses the estimated amounts the Secret Service paid for hotel rooms, rental cars, overtime pay, commercial airfare, logistical support, and golf cart rentals. OIG Report, ECF No. 9-4. However, the public Report contains redactions concealing the total cost of the trip, the number of Secret Service personnel on the trip, the total cost of meals and incidental expenses, and the single- and double-occupancy room rates charged to the government. Id.

CREW is a nonprofit organization that seeks to promote government integrity. Compl. ¶ 4. In March 2020, CREW submitted a FOIA request to DHS OIG seeking an unredacted copy of the Report. Pl. Response to Def. SUMF ¶ 1. DHS OIG denied CREW's request by letter in April 2020, stating that it had consulted with the Secret Service, which asserted that the information redacted from the public report was exempt from release under FOIA Exemptions 7(E) and 7(F), both of which protect certain law enforcement information. Callender Decl. Exh. 2, ECF No. 9-3. CREW promptly filed an administrative appeal. Pl. Response to Def. SUMF ¶ 4.

In May 2020, having received no decision on its administrative appeal, CREW filed this lawsuit seeking to compel disclosure of the unredacted OIG Report.[1] Less than a month later, DHS denied CREW's administrative appeal in relevant part. Pl. Response to Def. SUMF ¶ 5. The parties then determined that summary judgment briefing would be necessary to resolve their dispute over DHS's withholdings under Exemptions 7(E) and 7(F). Joint Status Report and Proposed Briefing Schedule 1-2.

DHS moved for summary judgment in August 2020. CREW then filed a cross-motion for summary judgment, challenging only the redactions of hotel room rates and costs of meals and incidentals. Both motions are now fully briefed.

## II. Legal Standards

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976). At the same time, FOIA contains a set of exemptions to an agency's general obligation to provide government records to the public, see 5 U.S.C. § 552(b), which are meant "to balance the public's interest in governmental transparency against legitimate governmental and private interests that could be harmed by release of certain types of information." United Techs. Corp. v. Dep't of Def., 601 F.3d 557, 559 (D.C. Cir. 2010) (cleaned up). Because FOIA "mandates a strong presumption in favor of disclosure," its "statutory exemptions, which are exclusive, are to be narrowly construed." Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir.

---

[1] The Complaint also seeks relief related to a separate FOIA request that CREW submitted to the Secret Service in December 2019. See Compl. ¶¶ 10-20. However, while this case was pending, DHS released records responsive to the December 2019 request, and CREW agreed not to pursue its claims regarding that request. Joint Status Report and Proposed Briefing Schedule 1.

2002) (internal quotation marks omitted).  Moreover, under the FOIA Improvement Act of 2016, agencies may withhold information only if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption" to FOIA or "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i).

Summary judgment is the typical and appropriate vehicle to resolve FOIA disputes.  See Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  When seeking summary judgment, the Government bears the burden to establish that its claimed FOIA exemptions apply to each record for which they are invoked.  ACLU v. Dep't of Def., 628 F.3d 612, 619 (D.C. Cir. 2011).  It may satisfy this burden through agency declarations that "describe[] the justifications for withholding the information with specific detail, demonstrat[ing] that the information withheld logically falls within the claimed exemption."  Id.  "Such declarations are entitled to a presumption of good faith, and the court can award the agency summary judgment based solely on the information so provided."  Judicial Watch, Inc. v. CIA, 310 F. Supp. 3d 34, 41 (D.D.C. 2018).  But agency declarations will not support summary judgment if the plaintiff puts forth contrary evidence or demonstrates the agency's bad faith.  ACLU, 628 F.3d at 619.

### III. Analysis

In their motion papers, the parties dispute only the withholding of the room rates and the estimated total cost of meals and incidentals paid to the Trump Turnberry Resort.  Pl. Mem. 4, ECF No. 11-1.  DHS's argument for redacting those figures can be distilled into two key propositions: (1) that the number of Secret Service personnel on the trip to Scotland is protected by FOIA Exemptions 7(E) and 7(F); and (2) that the redacted cost information is also protected

because it would indirectly reveal the size of the Secret Service detail. Def. Mem. 10-11, 14, ECF No. 9. The Court will address both propositions.

    A.  <u>The number of Secret Service personnel on the trip is exempt from disclosure.</u>

As an initial matter, DHS argues that the number of Secret Service personnel who accompanied President Trump to Scotland is exempt from disclosure under FOIA. CREW does not directly challenge DHS's redaction of that figure but does attack key aspects of the agency's argument in defense of the redaction. The issue is not merely academic; the Court must address it to lay the groundwork for its analysis of the parties' dispute over other redactions. As explained below, the Court agrees with DHS that the size of the Secret Service detail is protected from disclosure.

FOIA Exemption 7 permits an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production" of those records would result in one of eight enumerated consequences. 5 U.S.C. § 552(b)(7). Any invocation of Exemption 7 requires the agency, "as a preliminary matter, [to] make a threshold showing that the records were compiled for a law enforcement purpose." <u>Pinson v. Dep't of Justice</u>, 313 F. Supp. 3d 88, 113 (D.D.C. 2018) (internal quotation marks omitted). "The term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal." <u>Pub. Emps. for Env't Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico</u> ("<u>PEER</u>"), 740 F.3d 195, 203 (D.C. Cir. 2014). "[T]he term 'compiled' in Exemption 7 requires that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption." <u>Id.</u>

Two narrower provisions within Exemption 7 are relevant here. <u>First</u>, Exemption 7(E) provides that law enforcement records may be withheld if they "would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The Government has a "relatively low bar . . . to justify withholding" information under Exemption 7(E). Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011). "To clear that relatively low bar, an agency must demonstrate only that release of a document might increase the risk that a law will be violated or that past violators will escape legal consequences." PEER, 740 F.3d at 205 (internal quotation marks omitted). Second, Exemption 7(F) protects from disclosure law enforcement records that, if released, "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). The scope of Exemption 7(F) is "similarly broad" to that of Exemption 7(E). PEER, 740 F.3d at 205. "Disclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices." Id.

      Uncontroverted evidence in the record shows that Exemption 7 shields the number of Secret Service personnel who accompanied President Trump in Scotland. To begin, the OIG Report satisfies Exemption 7's law enforcement threshold. "There can be no doubt . . . that the Secret Service acts with a law enforcement purpose when it protects federal officials from attack, even though no investigation may be ongoing." Milner v. Dep't of Navy, 562 U.S. 562, 583 (2011) (Alito, J., concurring). It appears from the OIG Report that, in the course of carrying out its protective mission, the Secret Service kept records of key data about the trip to Scotland, which it later shared with DHS OIG. See OIG Report 6 (noting that DHS OIG "analyzed financial reports and supporting documents from DHS, Secret Service, and Department of State to identify the operational and temporary duty costs that the Secret Service incurred"). Such recordkeeping by the Secret Service qualifies as "compil[ing]" information "for law enforcement

purposes."  5 U.S.C. § 552(b)(7); see N.Y. Times Co. v. U.S. Secret Serv., No. 17 Civ. 1885 (PAC), 2018 WL 722420, at *4 (S.D.N.Y. Feb. 5, 2018) (Secret Service records on travel costs satisfied Exemption 7's law enforcement threshold).  That the Secret Service's data were later repackaged and discussed in the OIG Report does not make the data subject to disclosure, regardless of whether the OIG Report itself was compiled for law enforcement purposes.  See FBI v. Abramson, 456 U.S. 615, 631-32 (1982).[2]

To demonstrate that its withholding of the number of Secret Service personnel on the trip satisfies the more specific requirements of Exemptions 7(E) and 7(F), DHS submitted a declaration from Ronald L. Rowe Jr., Deputy Assistant Director in the Secret Service's Office of Protective Operations.  Mr. Rowe attests that "[t]he release of information indicating the number of Secret Service personnel that were assigned to the protective trip or that were housed in a particular location would reveal protective techniques and methodologies used by the Secret Service that are not generally known to the public."  Rowe Decl. ¶ 9, ECF No. 9-2.  He further explains:

> The number of Secret Service special agents and other personnel assigned in support of an agency protectee would clearly reveal the manpower present to conduct direct protection in such situations, and knowledge of the manpower strength present could provide a significant tactical advantage to those seeking to harm a Secret Service protectee. With this information, adversaries could more effectively plan, disable, or circumvent the Secret Service protective techniques. Further, with knowledge of the number of Secret Service personnel staffed on this

---

[2] Alternatively, there is a strong argument that the OIG Report itself was compiled for law enforcement purposes.  The Report contains a suggestion that one purpose of the audit was to help Congress determine whether any of the government's spending on President Trump's visit to his own resort was potentially illegal.  See OIG Report (summary page preceding body of Report, stating that DHS OIG "did not identify any fraud indicators or costs that were not authorized in relation to the President's visit to the Trump Turnberry Resort").  Courts have found that similar documents satisfy the law enforcement threshold.  See, e.g., Gould Inc. v. Gen. Servs. Admin., 688 F. Supp. 689, 691, 697 (D.D.C. 1988) (audit reports on government contracts were compiled for law enforcement purposes).

>particular trip, an adversary could better estimate the number of Secret Service personnel staffed on other Secret Service protectees' trips of similar size and scale, exposing other existing and future protectees to physical harm. The Secret Service investigates threats on a daily basis from individuals and groups that seek to do harm to protectees. Thus, I reasonably expect that the release of this information would endanger the lives or physical safety of individuals under the protection of the Secret Service as well as the lives and physical safety of Secret Service personnel.

Id.

Presuming, as the Court must, that Rowe's declaration was prepared and submitted in good faith, it easily clears the "relatively low bar" to justify withholding the number of Secret Service personnel under Exemption 7(E). PEER, 740 F.3d at 205. Based on his experience, Rowe informs the Court that prospective wrongdoers equipped with data about the Secret Service "manpower strength" protecting President Trump in Scotland "could better estimate the number of Secret Service personnel staffed on other Secret Service protectees' trips of similar size and scale" going forward. Rowe Decl. ¶ 9. And the ability to estimate the size of a future Secret Service detail, Rowe says, would put adversaries in a better position to "plan, disable, or circumvent the Secret Service protective techniques." Id. On its face, this is a logical and straightforward explanation of why revealing the number of Secret Service personnel on the trip "might increase the risk" of future crimes targeting the Secret Service and its protectees. PEER, 740 F.3d at 205.

CREW argues that the size of the Secret Service detail in Scotland is mere "historical staffing information" and would not "reveal law enforcement 'techniques and procedures' or 'guidelines' protected by Exemption 7(E)." Pl. Mem. 6. There is, of course, a difference between disclosing data about a single past Secret Service detail and publishing the Secret Service's written policies and guidelines that govern the staffing of protectees' trips. However, the case law does not "require[] the undisclosed information to *explicitly* reveal the specifics of a

8

technique or procedure before it can be withheld under Exemption 7(E)." Whittaker v. Dep't of Justice, No. 18-cv-01434 (APM), 2020 WL 6075681, at *5 (D.D.C. Oct. 15, 2020). On the contrary, courts recognize that "bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself." CIA v. Sims, 471 U.S. 159, 178 (1985) (internal quotation marks omitted). Accordingly, in some cases—particularly those "implicating national security"—Exemption 7(E) allows agencies to withhold data constituting "part of a complex mosaic" that, if pieced together, would reveal law enforcement techniques, procedures, or guidelines. Shapiro v. Dep't of Justice, 239 F. Supp. 3d 100, 115-16 (D.D.C. 2017); see also Whittaker, 2020 WL 6075681, at *5 (agency properly invoked Exemption 7(E) where it "demonstrated *some* chance that disclosure of [the withheld information] risks circumvention of the law via a mosaic effect").

The mosaic theory applies squarely to this case. Rowe specifically states that "the number of Secret Service personnel on a protective trip . . . would be one piece of information that could be combined with others to better understand [the Secret Service's] protective methods and their strengths and weaknesses." Rowe Decl. ¶ 13. This assessment is entitled to significant deference, given the undisputed national security interest in avoiding circumvention of Secret Service protection. See Ctr. for Nat'l Sec. Studies v. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[I]n the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."). Moreover, nothing in the record contradicts Rowe's representation that releasing the number of Secret Service personnel on the trip could help adversaries piece together the agency's travel-staffing techniques.

While the record does establish that "[t]he Secret Service creates individual security plans for every Presidential trip," Def. Response to Pl. Statement of Undisputed Material Facts ("Def. Response to Pl. SUMF") 1, ECF No. 13-1, this fact does not undermine the government's mosaic theory. DHS does not, and need not, argue that future Secret Service details will precisely match the one that protected President Trump in Scotland. The agency persuasively advances a more modest proposition: that disclosing the size of the Secret Service detail would tend to reveal the techniques, procedures, and guidelines that govern the creation of each unique travel plan, thus helping outsiders to "*estimate* the number of Secret Service personnel staffed on other Secret Service protectees' trips of similar size and scale." Rowe Decl. ¶ 9 (emphasis added); see also Def. Response to Pl. SUMF 1 (stating that each Secret Service plan for presidential travel "employs various law enforcement techniques and procedures that are repeated, including the strength of the similar details for similar trips"); N.Y. Times, 2018 WL 722420, at *8 (finding that "disclosure of the staffing levels" on Secret Service-protected flights in 2016 "would yield information on *all* future flights by those protected pursuant to the Service's mandate").[3] Worse, adopting an interpretation of FOIA that requires DHS to disclose this information would imply that DHS will need to release *every* piece of similar data requested under FOIA, making the Secret Service progressively more vulnerable to circumvention.

In seeking a different conclusion, CREW relies principally on Families for Freedom v. Customs & Border Protection, 837 F. Supp. 2d 287 (S.D.N.Y. 2011), but that case is both non-binding and distinguishable. In Families for Freedom, CBP withheld historical staffing data

---

[3] It is hardly implausible that the Secret Service might need to staff future trips that are very similar to the 2018 trip to Scotland. Former Presidents remain under Secret Service protection, Rowe Decl. ¶ 1, and one could readily foresee, for example, former President Trump returning to Turnberry's historic windswept links for a few more rounds.

regarding its efforts to apprehend unauthorized immigrants in transit, arguing that revealing "the manpower devoted to the transportation checks . . . would create the risk that individuals who have crossed the border illegally would attempt to evade Border Patrol efforts to apprehend them."  837 F. Supp. 2d at 298-99.  However, the government did not "assert that the current distribution of agents is similar to the distribution of agents" reflected in the withheld data, and the plaintiff provided uncontroverted "evidence showing that Border Patrol's practices [had] changed dramatically in recent months."  Id. at 299.  The court therefore found that the government had "provided no evidence" that disclosure of the withheld data would lead to "a *reasonable* increased risk of circumvention of the law."  Id. at 300.  Here, by contrast, nothing in the record suggests that the Secret Service's approach to overseas travel has "changed dramatically" since 2018.  Id. at 299.  If anything, Rowe's declaration provides evidence that the relevant Secret Service techniques, procedures, and guidelines remain fundamentally unchanged.  See Rowe Decl. ¶ 13 (stating that release of withheld data could help outside observers "to better understand our protective methods").

Exemption 7(E) thus allows DHS to withhold the number of Secret Service personnel on the trip to Scotland.  For similar reasons, so does Exemption 7(F).  To reiterate, Exemption 7(F) shields law enforcement information that "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).  Rowe explains that if "adversaries could more effectively plan, disable, or circumvent the Secret Service protective techniques," the expected result would be to "endanger the lives or physical safety of individuals under the protection of the Secret Service as well as the lives and physical safety of Secret Service personnel."  Rowe Decl. ¶ 9.  This reasoning is both intuitive and grounded in Rowe's professional expertise.

The FOIA Improvement Act does not require a different result. That statute permits agencies to withhold records under a FOIA exemption only if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption" or "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). Accordingly, "an agency must identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials and connect the harms in a meaningful way to the information withheld." Ctr. for Investigative Reporting v. U.S. Customs & Border Prot., 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (cleaned up). DHS has done that here. Rowe's declaration provides a specific explanation of how disclosure of information about the size of the President's Secret Service detail would result in foreseeable risks of harm to agents and those they protect. While CREW suggests that the Court should demand an even higher degree of foreseeability, see Pl. Mem. 11-12, doing so would mean ignoring the D.C. Circuit's precedents defining the substantive standards under Exemptions 7(E) and 7(F). That case law continues in force, even though much of it predates the FOIA Improvement Act. See Garza v. U.S. Marshals Serv., 2020 WL 768221, at *1 (D.C. Cir. Jan. 22, 2020) (adhering to pre-FOIA Improvement Act case law on scope of Exemption 7(E)); Brookens v. Acosta, 297 F. Supp. 3d 40, 49 (D.D.C. 2018) (district courts should "follow the case which directly controls, leaving to [the D.C. Circuit] the prerogative of overruling its own decisions" (quoting Agostini v. Felton, 521 U.S. 203, 207 (1997))).[4]

---

[4] This analysis does not turn the FOIA Improvement Act into mere surplusage. The statute provides a meaningful safeguard against agencies' use of "general explanations and boiler plate language" to justify withholdings—something DHS did not attempt here. Ctr. for Investigative Reporting, 436 F. Supp. 3d at 106 (internal quotation marks omitted). The effects of the FOIA Improvement Act are perhaps most strongly felt in cases involving the deliberative process privilege under FOIA Exemption 5. See id. (noting that "nearly all of the few decisions to have addressed the new foreseeable-harm requirement at any length have done so when considering the Exemption 5 deliberative-process privilege"). Unlike Exemption 5, the statutory

The Court therefore finds that the total number of Secret Service personnel staffing President Trump's trip to Scotland is exempt from disclosure.

      B. <u>DHS has adequately justified its redactions of information that would imply the approximate number of Secret Service personnel on the trip.</u>

CREW argues that even if DHS is entitled to redact the number of Secret Service personnel on the trip, it must disclose the rates the government paid for single- and double-occupancy rooms at the Trump Turnberry Resort and the estimated total cost of meals and incidental expenses. The Court disagrees. DHS has adequately demonstrated that releasing these figures could help wrongdoers estimate the number of Secret Service personnel on the trip, which in turn could help them predict the size of future Secret Service details.

The Court first considers DHS's withholding of room rates. In his declaration, Rowe points out that the public version of the OIG Report discloses the total amount the government paid for rooms at the Trump Turnberry ($322,427). Rowe Decl. ¶ 10; <u>see also</u> OIG Report 2. Therefore, he says, "the room rates serves (sic) as a proxy for the number of personnel assigned to the protective detail. If the individual room rate, single or double occupancy, were revealed along with the total paid to the Trump Turnberry Resort, then the number of Secret Service employees staying on the property could be readily ascertained." Rowe Decl. ¶ 10.

CREW disputes that the size of the Secret Service detail could be "readily ascertained" by comparing the total cost of all hotel rooms to the rates for single and double rooms. "Even if the room rates for single and double occupancy rooms were disclosed," CREW says, "it would still be unclear how many personnel stayed in single versus double occupancy rooms, how many

---

text of Exemption 7 predating the FOIA Improvement Act already contained an explicit requirement that the agency show a reasonable nexus between the withheld information and a predicted harm. <u>Compare</u> 5 U.S.C. § 552(b)(5) <u>with</u> <u>id.</u> § 552(b)(7).

13

personnel stayed in each double occupancy room, [or] the number of days members of the protective detail stayed in each room." Pl. Mem. 8. CREW has a point. For the reasons CREW highlights, Rowe's explanation does fall short of establishing that revealing the room rates would effectively disclose the *precise* number of Secret Service personnel staying at the resort.

Nevertheless, the record supports a conclusion that the room rates would be useful for at least *estimating* the size of the Secret Service detail. Rowe's assertion that the room rates are "a proxy for the number of personnel assigned to the protective detail" may be a slight oversimplification, but it is fairly read to convey a somewhat more nuanced point: that the room rates, together with the total charge for all rooms, would reveal how many single-occupancy room nights and how many double-occupancy room nights were charged to the government. The Court owes some deference to DHS's position on this factual matter, unless it is somehow contradicted by the record or mathematically implausible. It is not. Algebraically speaking, it is sometimes the case that if X is known to equal a multiple of Y plus a multiple of Z, disclosing the values of X, Y, and Z would reveal the exact numbers of Ys and Zs that must be added to reach X.[5] The Court understands Rowe to be asserting that in this case, knowing the rates for single- and double-occupancy rooms would allow an outsider to deduce how many nights in each type of room must have been added to reach $322,427. Applying the presumption of good faith, the Court accepts this factual proposition as true.[6]

---

[5] To use a simple illustration, suppose that golf balls were sold only in sleeves of three and four. If a duffer needed exactly ten golf balls, she must buy two three-packs and one four-pack.

[6] Even if there are multiple mathematically possible ways to add to $322,427 in increments of the single- and double-occupancy room rates, knowing those rates would still be helpful in estimating the number of nights the government reserved in each type of room. An

After learning the respective numbers (or approximate numbers) of single-occupancy and double-occupancy room nights charged to the government, an observer would be better equipped to estimate the size of the Secret Service detail. As Rowe points out, Rowe Decl. ¶ 11, the number of nights the President stayed at the Trump Turnberry has been reported in the media and provides at least some indication of how long the Secret Service decamped at the resort.[7] Using information about the length of the trip and the number of nights booked for each type of room, an outsider could approximate the number of beds the government reserved for Secret Service personnel on an average night during the visit to the Trump Turnberry. The number of beds would provide a reasonable proxy for the number of Secret Service personnel, even if it is technically possible that some beds were unoccupied (if, e.g., an agent stayed alone in a double-occupancy room).

Because disclosing the room rates for single- and double-occupancy rooms could help outsiders estimate the size of the Secret Service detail in Scotland, those rates may be withheld under Exemptions 7(E) and 7(F). As discussed above, information about the number of Secret Service personnel on the trip to Scotland could make it easier to estimate the size of future Secret Service details, increasing the risk of circumvention of Secret Service techniques and potentially subjecting individuals to physical harm. To be sure, DHS's theory of harm from the release of

---

outsider could use this information to determine the highest and lowest possible numbers of each room type the government could have booked.

[7] CREW argues that press reports are not "an accurate indicator of the length of the Secret Service personnel's stay at Turnberry because, as the OIG observed, the 'Secret Service travels to locations before, during, and after the President or other protectees are physically at the site for site preparation and close out activities.'" Pl. Mem. 9 (quoting OIG Report 7 n.4). CREW is correct that the length of the Secret Service's stay may be somewhat different from the length of the President's stay, but Rowe's declaration indicates (and common sense confirms) that the two are closely related.

room rates is more attenuated than its argument for redacting the actual size of the Secret Service detail, since the room rates would imply only an *approximate* number of Secret Service personnel. Still, DHS's burden under Exemptions 7(E) and 7(F) is modest, and the agency has amply carried that burden as to room rates. See Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009) ("the chance of a reasonably expected risk" satisfies Exemption 7(E)); PEER, 740 F.3d at 205 (Under Exemption 7(F), "[d]isclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices.").[8]

It is even clearer that DHS properly withheld the amounts paid by the government for meals and incidental expenses in Scotland. As the OIG Report indicates, the redacted total for meals and incidental expenses is an "estimate" calculated by assuming that each Secret Service employee ran up a tab of $92 per full day at the resort and $69 per arrival or departure day. OIG Report 7; see also Rowe Decl. ¶ 11. As Rowe explains, an outsider who knew the approximate duration of the trip, the total estimated cost of meals and incidentals, and the per diem rates underlying that estimate could use "simple division" to "reveal or suggest the number of Secret Service personnel who claimed expenses." Rowe Decl. ¶ 11. CREW responds by pointing out that the exact length of the Secret Service's stay at the resort is not publicly known, which would make any attempt to reverse-engineer the number of Secret Service personnel imprecise. Pl. Mem. 9. But again, Exemptions 7(E) and 7(F) do not demand a showing that the withheld information would reveal the *exact* size of the Secret Service detail. Nor does it help CREW's

---

[8] CREW suggests that DHS's argument is "undermined by its previous disclosure of room rates charged to the Secret Service at other Trump properties in response to other FOIA requests" but disclaims any contention that DHS's past disclosures waived the protection of Exemption 7. Pl. Mem. 9; Pl. Reply 4-5. The Court, of course, expresses no view on whether DHS could have lawfully withheld the information it released pursuant to other FOIA requests. It simply concludes that the withholdings *in this case* are adequately justified.

position to observe that the redacted figure is "an *estimate*." Pl. Mem. 10.  The OIG Report makes clear that while DHS OIG relied on an estimate of spending rates, its calculations incorporated the real number of Secret Service personnel.  See OIG Report 7.

Accordingly, the challenged redactions in the OIG Report were proper under Exemptions 7(E) and 7(F).

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross-Motion for Summary Judgment.  A separate Order shall accompany this memorandum opinion.

CHRISTOPHER R. COOPER  
United States District Judge

Date: March 12, 2021